Filed 2/7/14  Baldwin v. Bank of America CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| MARVIN BALDWIN, | B243789 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC452085) |
| BANK OF AMERICA, N.A., | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Malcolm Mackey, Judge.  Affirmed.

Law Offices of Lenore Albert and Lenore L. Albert for Plaintiff and Appellant.

Reed Smith, David J. de Jesus, Peter Kennedy, and Michael Gerst; Severson & Werson, Mark Kenney and Robert Gandy for Defendant and Respondent.

Marvin Baldwin appeals from the dismissal of this action stemming from the sale of his home at a foreclosure auction. He contends the trial court erred in sustaining a demurrer by defendant and respondent Bank of America, N.A. (the Bank) to his second amended complaint without leave to amend. He argues that the cause of action for breach of contract should be reinstated because the Bank lulled him into inaction. He also argues that he adequately alleged causes of action for fraud and unfair business practices under Business and Professions Code section 17200. Baldwin contends the trial court should have given him leave to amend, and should not have stricken the third amended complaint filed before the hearing on the demurrer to the second amended complaint.

Baldwin concedes that the trial court denied leave to file a third amended complaint. We conclude that the trial court properly exercised its authority to correct the order granting leave to file a third amended complaint nunc pro tunc so that it conformed to the court's oral ruling denying leave to amend. Baldwin cannot state a cause of action on any theory advanced, and cannot amend to state a viable cause of action. We affirm the judgment of dismissal.

**FACTUAL AND PROCEDURAL SUMMARY**

We take our summary from the allegations of the second amended complaint, the charging pleading. Baldwin purchased a triplex in Long Beach in July 2006, by grant deed. In March 2007, he borrowed $584,000 from J & R Lending, secured by a note and deed of trust to finance purchase of another triplex in Long Beach. Mortgage Electronic Registration Systems, Inc. (MERS) was the beneficiary on the deed of trust. The Bank identifies itself as successor by merger to BAC Home Loans Servicing, L.P.

On August 3, 2009, Jill Balentine, Senior Vice President Home Retention Division of BAC Home Loans Servicing, L.P.[1], wrote to Baldwin and his wife. They were

---

[1] The letter identifies this entity as a subsidiary of Bank of America that serviced Baldwin's mortgage.

2

informed that their mortgage recently had been evaluated. The letter stated: "We are pleased to confirm that you qualify for the Fannie Mae HomeSaver Forbearance Program." The letter explained that Baldwin was "eligible for a reduced mortgage payment for up to six months. [¶] Under the HomeSaver Forbearance Program, we are working with Fannie Mae, a government-sponsored enterprise, to reduce your mortgage payment by up to 50% for up to 6 months *while we work with you to find a long-term solution. This is not a permanent payment reduction, but it will allow you to stay in your home as we work together to find a solution.*" (Italics added.) The Letter instructed Baldwin on how to sign up for the forbearance program and to make the first monthly payment. The letter concluded: "We want to help you." Contact information for questions was provided, and Baldwin was told that he might be contacted by a representative of the Bank to discuss the program. The letter ended: "Please take advantage of the opportunity to start a dialogue and get the help you need."

In 2009, Fannie Mae instituted the HomeSaver Forbearance Program, which was available to those who did not qualify for [Home Affordable Mortgage Program] HAMP loan modifications."[2] Baldwin's second amended complaint alleged that the forbearance program was available to investors on second homes, leading to loan modifications of

---

[2] "Fannie Mae's Announcement 09–05R, issued in April 2009, stated: "HomeSaver Forbearance is a new loss mitigation option available to borrowers [who] are either in default or for whom default is imminent and who do not qualify for the HAMP. A servicer should offer a HomeSaver Forbearance if such borrowers have a willingness and ability to make reduced monthly payments of at least one-half of their contractual monthly payment. The plan should reduce the borrower's payments to an amount the borrower can afford, but no less than 50 percent of the borrower's contractual monthly payment, including taxes and insurance and any other escrow items at the time the forbearance is implemented. During the six month period of forbearance, the servicer should work with the borrower to identify the feasibility of, and implement, a more permanent foreclosure prevention alternative. *The servicer should evaluate and identify a permanent solution during the first three months of the forbearance period and should implement the alternative by the end of the sixth month.*" (Announcement 09–05R, supra, at pp. 31–32 <https:// www.fanniemae.com/content/announcement/0905.pdf> [as of Oct. 31, 2013], italics added.) We grant Baldwin's request that we take judicial notice of this announcement.

30 percent to 50 percent less than the current mortgage payment for those who made their payments under the program.

Attached to the August 3 letter was the HomeSaver Payment Forbearance Agreement (Forbearance Agreement), which Baldwin alleged he accepted. Under that agreement, Baldwin represented that either his loan was in default, or that he believed he would be in default in the near future, and that he did not have access to sufficient liquid assets to make the scheduled monthly mortgage payments at present or in the near future. He also was required to make representations about the veracity of information concerning his financial status. Baldwin agreed to make reduced monthly payments of $2,429.93, beginning on September 1, 2009 and ending on February 1, 2010. During this six-month "deferral period" the Bank agreed to suspend any scheduled foreclosure sale, provided Baldwin met his obligations under the Forbearance Agreement.

Paragraph 2C of the Forbearance Agreement stated that the Bank would review the loan during the deferral period to determine whether additional default resolution assistance could be offered to Baldwin. Several possible courses were outlined. Under one scenario, Baldwin would be required to recommence regularly scheduled payments and make additional payment(s) on terms to be determined by the Bank until all past due amounts owed under the loan documents were paid in full. Or Baldwin would be required to reinstate the loan in full. Alternatively, the Bank would offer to modify the loan or offer some other form of payment assistance or alternative to foreclosure. Finally, "if no feasible alternative [could] be identified," the Bank reserved its right to commence or continue foreclosure proceedings or exercise other rights and remedies provided under the loan documents.

Baldwin and his wife executed the Forbearance Agreement on August 26, 2009. The second amended complaint alleged that he made the monthly payments from September through December 2009, until the HomeSaver Forbearance Program was terminated by Fannie Mae in January 2010, and replaced with the Payment Reduction Program. He alleged that at the end of the deferral period, he "was not offered one of the

4

options placed in the [Forbearance Agreement in paragraph 2C] or transferred into the new program."

On August 9, 2010, a notice of default was recorded against Baldwin's property, which was in arrears in the amount of $45,090.87 as of August 6, 2010. The notice warned that if the property was in foreclosure, it might be sold without court action. Baldwin alleged that this notice was not mailed to him as required by Code of Civil Procedure section 2924, subdivisions (b)(1) and (4). The same day, MERS substituted Recontrust Company as trustee under the deed of trust. All beneficial interest under the deed of trust was conveyed to BAC Home Loans Servicing, LP, FKA Countrywide Home Loans Servicing LP, which began servicing the loan. Baldwin alleged that he offered to reinstate the terms of the previous financial agreement or similar terms so all amounts due could be paid and the default cured.

Baldwin alleged that in October 2010, the Bank issued a press release announcing a moratorium on foreclosure sales while it investigated claims of irregularities in its foreclosure procedures. It also alleged that the Bank had announced that it would suspend foreclosures during the holidays in 2010. Baldwin alleged that he heard these statements, believed them to be true, and in justifiable reliance did not seek bankruptcy protection or other judicial relief to stop the sale of his home during this period of time. Baldwin's home was sold at a foreclosure auction on December 8, 2010.

Baldwin filed his first complaint in propria persona against the Bank on December 28, 2010. He alleged breach of contract, fraud, conspiracy, cancellation of the trustee's deed upon sale, and declaratory/injunctive relief. After obtaining counsel, on April 19, 2011, Baldwin filed a first amended complaint alleging breach of contract, breach of contract on a third party beneficiary theory, fraud/misrepresentation of a material fact, and unfair practices under Business and Professions Code section 17200. The court sustained defendants' demurrer with leave to amend on November 29, 2011.

The second amended complaint was filed December 19, 2011, alleging causes of action for breach of contract (promissory estoppel), breach of contract (third party beneficiary), fraud, and unlawful acts in violation of Business and Professions Code

5

section 17200. In February 2012, the parties stipulated to continue the trial date, and agreed Baldwin would have up to March 20, 2012 to amend the second amended complaint. The Bank was to be allowed to respond to the newly amended (third amended) complaint. The Bank and Baldwin brought a joint ex parte application to continue the trial and all related dates pursuant to the stipulation. The proposed order included language which would have granted Baldwin leave to amend the complaint, and the Bank leave to respond. On February 9, 2012, the court granted the application, but its minute order did not state that Baldwin was given leave to file a third amended complaint. On June 8, 2012, the Bank demurred to the second amended complaint.

On June 20, 2012, counsel for Baldwin filed an ex parte application for leave to amend. She also asked the court to take the demurrer to the second amended complaint off calendar. In her supporting declaration, counsel reminded the court that the parties previously had stipulated to the amendment. She explained that the omission of leave to amend from the February 9 order was discovered when she "went to amend the complaint." A copy of the proposed third amended class action complaint (mislabeled as second amended class action complaint) was attached to the ex parte application. On June 20, 2012, the trial court granted the ex parte application for leave to amend the pleadings, but left the demurrer to the second amended complaint on calendar.

On July 10, 2012, Baldwin filed a third amended class action complaint. At the hearing on the demurrer to the second amended complaint on July 12, 2012, the court indicated its tentative was to sustain it without leave to amend as to all causes of action. Counsel for Baldwin informed the court that this ruling created a procedural irregularity because the second amended complaint was superseded and rendered moot when the third amended complaint was filed with leave of court. The court indicated that it was unaware of the third amended class action complaint. The trial court addressed the merits of the demurrer to the second amended complaint and sustained it without leave to amend. It ordered the third amended complaint filed July 10, 2012 be stricken. The action was dismissed with prejudice. Baldwin filed a timely appeal.

6

## DISCUSSION

### I

The trial court ruled on the demurrer to the second amended complaint after the third amended complaint had been filed, and then struck the third amended complaint. We sent counsel a letter pursuant to Government Code section 68081 asking that they address whether the trial court was authorized to do so.[3] The original deadline for responses to our letter was October 28, 2013. On October 24, 2013, counsel for the Bank requested three additional days to respond because he was engaged on another matter out-of-state. We granted the request, giving each side until Thursday, October 31 to file their responses.

On Monday, October 28, the Bank filed an ex parte application in the trial court seeking a nunc pro tunc order changing the June 20, 2012 ruling from one that granted leave to amend to one that denied leave to amend. The June 20, 2012 hearing was not reported. The application was accompanied by a declaration from counsel for the Bank with an account of the June 20, 2012 hearing. The declaration states that while the court initially indicated leave to amend would be granted, after argument it reversed its thinking and denied leave to amend. The Bank characterizes the change as correcting a clerical error and that the minute order of the June 20, 2012 hearing granting leave to amend instead should have stated that leave to amend was denied. At oral argument, and in her opening brief on appeal, counsel for Baldwin concedes that the trial court orally denied leave to file the third amended complaint, and that the ensuing minute order erroneously stated that leave to amend was granted.

Under these circumstances, we conclude the court acted within its authority to correct the minute order nunc pro tunc even though the Bank had not previously raised the claim that leave to amend actually was *denied* at the June 20, 2012 hearing.

---

[3] We grant Bank's motion to augment the record on appeal with the ex parte application and nunc pro tunc order in order to fully examine the course taken by the Bank.

7

The established rule is that a court may correct a clerical error, as distinguished from a judicial error, which appears on the face of a decree by a nunc pro tunc order. (*In re Marriage of Padgett* (2009) 172 Cal.App.4th 830, 852 (*Padgett*), quoting *Estate of Eckstrom* (1960) 54 Cal.2d 540, 544 (*Eckstrom*).) In *Eckstrom* the Supreme Court emphasized that a court cannot change a final order, even though made in error, ""'if in fact the order made was that intended to be made.'"" (*Ibid.*) The *Eckstrom* court identified the question before the court on a hearing for a motion for a nunc pro tunc order as what order was in fact made at the original time by the trial judge. (*Ibid.*) "It is only when the form of the judgment fails to coincide with the substance thereof, as intended at the time of the rendition of the judgment, that it can be reached by a corrective nunc pro tunc order" [Citations.]' (*Hamilton v. Laine* [(1997)] 57 Cal.App.4th [885,] 890; accord, *APRI Ins. Co. v. Superior Court* (1999) 76 Cal.App.4th 176, 185.)" (*Padgett*, at p. 852.) Since both sides agree the court's oral pronouncement was to deny leave to amend, a clerical error in the minute order stating otherwise is demonstrated.

The trial court was authorized to correct the clerical error in the minute order of June 20, 2012 to state that leave to file the third amended complaint was denied. The demurrer to the second amended complaint was properly before the trial court and it did not exceed its jurisdiction in striking the unauthorized third amended complaint. We turn to the substantive issues raised by the demurrer.

II

"A demurrer tests the legal sufficiency of the factual allegations in a complaint. We independently review the sustaining of a demurrer and determine de novo whether the complaint alleges facts sufficient to state a cause of action or discloses a complete defense. [Citation.] We assume the truth of the properly pleaded factual allegations, facts that reasonably can be inferred from those expressly pleaded and matters of which judicial notice has been taken. [Citation.] We construe the pleading in a reasonable manner and read the allegations in context. [Citation.] We must affirm the judgment if the sustaining of a general demurrer was proper on any of the grounds stated in the

8

demurrer, regardless of the trial court's stated reasons. [Citation.]" (*Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75, 81.) "It is an abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable probability that the defect can be cured by amendment. [Citation.] The burden is on the plaintiff to demonstrate how the complaint can be amended to state a valid cause of action. [Citation.] The plaintiff can make that showing for the first time on appeal. [Citation.]" (*Ibid.*)

III

Baldwin argues the trial court erred in sustaining the demurrer to the breach of contract cause of action. He also cites language in the Forbearance Agreement in which the Bank promised that it "would work together" with Baldwin to find a "long term solution."

The gravamen of the cause of action for breach of contract is that the Bank breached its promise to review Baldwin's loan to determine whether any additional default assistance could be offered to him after the deferral period. Paragraph 2C of the Forbearance Agreement states: "During the Deferral Period, Servicer will review my Loan to determine whether additional default resolution assistance can be offered to me. At the end of the Deferral Period either (1) I will be required to recommence my regularly scheduled payments and to make additional payment(s), on terms to be determined by Servicer, until all past due amounts owed under the Loan documents have been paid in full, (2) I will be required to reinstate my Loan in full, (3) Servicer will offer to modify my Loan[,] (4) Servicer will offer me some other form of payment assistance or alternative to foreclosure, on terms to be determined solely by Servicer . . . , or (5) if no feasible alternative can be identified, Servicer may commence or continue foreclosure proceedings or exercise other rights and remedies provided Servicer under the Loan Documents."

The charging pleading alleged that Baldwin relied on this promise by performing under the Forbearance Agreement and making payments from September through December 2009, until Fannie Mae discontinued the program in January 2010. But he

9

alleged the Bank did not work with him to find a more permanent resolution.  He also alleged the Bank proceeded with the nonjudicial foreclosure sale in December 2010, despite the Bank's announcement that it had placed a moratorium on home foreclosures for the 2010 holiday period.

Baldwin also relies on the August 3, 2009 letter signed by Jill Ballantine, a senior vice president of the home retention division of BAC Home Loans Servicing, LP, which was mailed to Baldwin with the Forbearance Agreement.  That letter, incorporated as an exhibit to the second amended complaint, informed Baldwin that he qualified for the Fannie Mae HomeSaver Forbearance Program.  It stated:  "This is not a permanent payment reduction, but it will allow you to stay in your home as we work together to find a solution."  The letter closed:  "We want to help you.  Remember, if you have any questions, please contact us . . . .  Additionally, you may receive a phone call from one of our representatives to discuss the HomeSaver Forbearance Program.  Please take advantage of the opportunity to start a dialogue and get the help you need."

The Bank argues that the Forbearance Agreement did not guarantee Baldwin a permanent alternative to foreclosure or a loan modification.  It cites Paragraph 2A which warned:  "If this Agreement terminates, however, then any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action, all rights to such notices being hereby waived to the extent permitted by Applicable Law . . . ."  Paragraph 2B. provided that if the borrower had not entered into another agreement with the servicer (the Bank) to cure or otherwise resolve the default, or reinstated his loan in full, then "the Servicer will have all of the rights and remedies provided by the Loan Documents . . . ."

In addition, paragraph 2D warned that the Forbearance Agreement was not a forgiveness of payments on the loan or a modification of loan documents:  "I further understand and agree that the Servicer is not obligated or bound to make any modification of the Loan Documents or provide any other alternative resolution of my

default under the Loan Documents." Paragraph 2L expressly stated that the Bank was not waiving any right or remedy, including foreclosure.

The Bank argues that Baldwin cannot properly allege breach of contract in the face of these provisions which warned that the Bank did not promise to permanently modify his loan and that it retained its rights to foreclose in the event no permanent solution was reached. The Bank contends that it was not obligated to modify the loan and therefore was within its rights to foreclose after the deferral period ended. In other words, it argues that it only promised not to foreclose during the six month deferral period, and that Baldwin received the benefit of that bargain because the property was not sold during that period.[4]

We are satisfied that Baldwin adequately alleged that the Forbearance Agreement constitutes an enforceable contract by which the Bank agreed to work with him to determine whether additional default relief could be offered under paragraph 2C of the agreement. Paragraph 2A provides that any foreclosure sale would be suspended if Baldwin made the payments during the deferral period. But it expressly stated that if the Agreement terminated, the Bank could resume foreclosure proceedings.

The Forbearance Agreement was a contract to negotiate in good faith. (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1171, citing *Copeland v. Baskin Robbins, U.S.A.* (2002) 96 Cal.App.4th 1251, 1253 [recognizing cause of action for breach of agreement to negotiate in good faith].) "Failure to agree is not, itself, a breach of the contract to negotiate.' [Citation.]" (*Ibid.*) "Only when the parties are under a contractual compulsion to negotiate does the covenant of good faith and fair dealing attach, as it does in every contract. In the latter situation the implied covenant of good faith and fair dealing has the salutary effect of creating a disincentive for acting in

_____

[4] Bank argues that there was no binding contract because it did not sign the agreement as required by the Forbearance Agreement. Nevertheless it contends we need not reach this issue because there was no breach of contract even if it was binding. We agree that we need not address the issue and proceed to the merits of the breach of contract cause of action.

bad faith in contract negotiations." (*Copeland v. Baskin Robbins U.S.A.*, at p. 1260, fn. omitted.)

Here, Baldwin alleged that although he made all requested payments "to the date of termination of the program" he was "not offered one of the options placed in the HOMESAVER plan or transferred into the new program." He alleged that once he learned a foreclosure auction was scheduled, "he offered to reinstate the terms of the previous financial agreement or similar terms in order that all amounts due and owing to defendants could be repaid and the default be cured." This offer was allegedly rejected and the house was sold at foreclosure. Baldwin did not allege that he would have qualified for the other potential relief referenced in the Forbearance Agreement.

Baldwin alleged that the Bank breached the Forbearance Agreement "by terminating the 'Deferral Period' although the Servicer (i) never executed the Agreement, (ii) never offered another resolution of any default such as a modification, pre-foreclosure sale or deed in lieu of foreclosure, or (iii) found Mr. Baldwin under default under the program." The breach of contract cause of action alleged that the Bank did not offer another resolution of his default, nor inform him whether he was approved or denied a loan modification as he requested at the end of the sixth month of the deferral period, nor did it disclose the amount his loan was in arrears in the sixth month when no other form of relief was forthcoming from the Bank. Instead, the Bank pursued foreclosure without providing the HomeSaver resolution the Bank was required to identify and provide. Baldwin argues that, contrary to the promises made in the Forbearance Agreement, the Bank did not work with him to find a long-term solution, and provide another resolution during the deferral period. He alleged that the sale went forward despite the Bank's announcement that it was placing a moratorium on foreclosures for the 2010 holiday period, an issue we discuss next.

Baldwin alleged that had he known the sale was going forward in December 2010, "he would have taken steps to protect his home, including filing a petition for Chapter 13 bankruptcy." He alleged: "Because defendants broke their promise, Mr. Baldwin faced the loss of his home, disruption of his life, worry, anxiety, financial loss, including

12

damage to their credit, and other emotional distress." He sought "compensatory damages for [his] financial loss, the loss of [his] home, damages for emotional distress, an injunction ordering defendants to cancel the foreclosure sale, return title to Mr. Baldwin, and reinstate Mr. Baldwin's home loan." He also sought an award of attorney fees.

"To allege a cause of action for damages for breach of contract, a plaintiff must allege, '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' [Citation.]" (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th at p. 921.) "'[I]t is essential to establish a causal connection between the breach and the damages sought.' [Citation.]" (*Thompson Pacific Const., Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 541.) "Compensatory damages for breach of contract are not measured by the gain to the breaching party. Instead, general damages are to compensate the aggrieved party for loss of the benefits he would have received by performance. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 869, p. 956.)" (*County of Ventura v. Channel Islands Marina, Inc.* (2008) 159 Cal.App.4th 615, 627.)

In a cause of action for breach of contract, the plaintiff must plead that the defendant's breach was a substantial factor in causing his or her damages. (*See Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 247, fn. 3.) "'The test for causation in a breach of contract . . . action is whether the breach was a substantial factor in causing the damages. [Citation.] "Causation of damages in contract cases, as in tort cases, requires that the damages be proximately caused by the defendant's breach, and that their causal occurrence be at least reasonably certain." [Citation.] A proximate cause of loss or damage is something that is a substantial factor in bringing about that loss or damage. [Citations.] The term "substantial factor" has no precise definition, but "it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result."' (*US Ecology, Inc. v. State* (2005) 129 Cal.App.4th 887, 909.)" (*Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 871–872)

Baldwin sufficiently alleged that the Bank breached the terms of the Forbearance Agreement by failing to work with him in an effort to find a long-term solution to his inability to pay his mortgage to take effect after the forbearance deferral period ended. But Baldwin does not allege that his damages, including the foreclosure sale of his house, were caused by that breach. As the Bank argues, under the terms of the Forbearance Agreement, it was not obligated to provide a permanent loan modification or other resolution. The Forbearance Agreement expressly provided that foreclosure proceedings could resume or be initiated once the deferral period ended. The allegations of the second amended complaint are that the Bank did not foreclose until more than nine months after the end of the Forbearance Agreement, by which time it was entitled to proceed with foreclosure unless some other arrangement had been made with Baldwin. Under these circumstances, Baldwin did not establish his claim that the ultimate foreclosure sale was a result of the Bank's breach of the terminated Forbearance Agreement.

The parties cite many cases in the context of actions brought by borrowers where efforts to modify loans did not stave off foreclosure despite negotiations or even agreements with lenders or servicers to provide relief to the borrowers. For example, we granted their joint request to brief the very recent opinion of the Fourth Appellate District, Division 3 in *Lueras v. BAC Home Loans Servicing, LP* (2013) 221 Cal.App.4th 49 (*Lueras*), a case involving an agreement under the same HomeSaver Forbearance Program at issue here. But unlike our case, in *Lueras* the plaintiff alleged a pattern of contradictory and misleading communications from defendant during the deferral period under the Forbearance Agreement as to whether he would receive long-term or permanent relief to avoid foreclosure.

Here, Baldwin did not allege such a pattern. In fact, he alleged no direct communications with the Bank until he was notified of the pending foreclosure sale. At that point, he alleged that "he offered to reinstate the terms of the previous financial agreement or similar terms in order that all amounts due and owing to defendants could be repaid and the default be cured." This offer allegedly was rejected and the house sold.

14

Instead of individual negotiations and communications with the Bank as to his eligibility for another form of relief, Baldwin alleged that he relied on national media reports that the Bank had placed a moratorium on foreclosure sales during the holiday period in 2010. As we shall explain, those allegations cannot serve as the basis for a valid cause of action under any theory.

In sum, while we agree that Baldwin has pleaded the existence of a contract between himself and the Bank by which the Bank would forbear from foreclosing for a six month period if Baldwin made the prescribed payments, and that it would work with him in an effort to find other options for relief, and that it failed to do so, he has not adequately pleaded resulting damages. Nor has he demonstrated that he could plead such damages if afforded a further opportunity to do so. The Bank promised to work with Baldwin, it did not promise to resolve the problem. We do not know and cannot know whether further efforts toward a resolution would have led to a solution or what that solution might have been. Since those factors are unknown and unknowable, the amount of damages, if any, is necessarily speculative.

The absence of an obligation to modify the loan or to provide other permanent relief distinguishes this case from *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 (*West*) and *Wigod v. Wells Fargo Bank, N.A.* (7th Cir. 2012) 673 F.3d 547 (*Wigod*), which were brought under the separate Home Affordable Mortgage Program (HAMP). HAMP was intended to "'provide relief to borrowers who have defaulted on their mortgage payment or who are likely to default by reducing mortgage payments to sustainable levels, without discharging any of the underlying debt.' [Citation.]" (*West*, *supra*, 214 Cal.App.4th at p. 785.) Based on a directive issued by the United States Department of the Treasury, the courts in *West* and *Wigod* held "that when a borrower complies with all the terms of a TTP [trial period plan], and the borrower's representations remain true and correct, the loan servicer *must* offer the borrower a permanent loan modification. As a party to a TPP, a borrower may sue the lender of loan servicer for its breach." (*West*, *supra*, at pp. 736, 796–798; *Wigod*, *supra*, 673 F.3d at

15

557, 559, fn. 4; see also *Bushell v. JPMorgan Chase Bank, N.A.*, *supra*, 220 Cal.App.4th at pp. 924–927 [same].)

““"It is fundamental that [contract] damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." [Citation.]" (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 473, disapproved on another ground in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352, fn. 17.) We conclude that although a breach of the Forbearance Agreement is alleged, Baldwin cannot allege that his damages were proximately caused by that breach under the circumstances presented here. The trial court did not err in sustaining the demurrer to this cause of action.

IV

Baldwin's alternative breach of contract theory alleged that his home was sold through a nonjudicial foreclosure auction sale in December 2010 even though the Bank had announced a moratorium on home foreclosures for the 2010 holiday period. The fraud cause of action is based on the same moratorium announcement. We reserve our discussion of the Business and Professions Code section 17200 claim for the next part of this opinion.

*A. Breach of Contract*

In support of his breach of contract claim based on the moratorium announcement, Baldwin relies on *Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665 (*Raedeke*), in which the plaintiffs sued for wrongful foreclosure. After the plaintiffs' loan became delinquent and a trustee's sale was scheduled, Gibraltar orally agreed to postpone the sale because negotiations were underway with prospective buyers for the property. Despite the alleged oral agreement, and although a willing buyer had been procured, Gibraltar proceeded with the trustee's sale. Plaintiffs sued, alleging that they had not taken other steps to cure the default in reliance on the agreement to postpone the sale. A jury found that Gibraltar promised to postpone the sale and that plaintiffs had satisfied the condition of procuring a willing buyer. Despite the jury verdict for plaintiffs, the trial court treated the jury's verdict as advisory only, and found that

16

Gibraltar did not promise to postpone the sale and that plaintiffs were not misled or lulled into inaction. (*Id*. at p. 669–670.)

The issue in *Raedeke* was whether the case presented equitable issues for resolution by the trial court, or legal issues for resolution by the jury. The Supreme Court concluded that the plaintiffs had presented a viable legal theory based on breach of an oral contract to postpone the sale, properly determined by the jury, not the trial court. It directed the court to enter judgment for plaintiffs on the verdict. (*Raedeke*, *supra*, 10 Cal.3d at pp. 674–675.) Baldwin argues that, like the plaintiffs in *Raedeke*, he was lulled into inaction and is entitled to recovery against the Bank on that theory. *Raedeke* is distinguishable because in that case, the plaintiff alleged a postponement had been offered and accepted, forming an oral contract to postpone the sale. Here, as we explain, Baldwin cannot allege such an enforceable agreement.

"An essential element of any contract is the consent of the parties, or mutual assent. (Civ. Code, §§ 1550, subd. 2, 1565, subd. 2.) Mutual assent usually is manifested by an offer communicated to the offeree and *an acceptance communicated to the offeror*. (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 128, p. 153 (hereafter Witkin).) ""'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" [Citations.]' (*City of Moorpark v. Moorpark Unified School Dist.* (1991) 54 Cal.3d 921, 930.) The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances. [Citation.] The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer. (1 Witkin [9th ed. 1987] Contracts, § 119, p. 144; 1 Farnsworth, Contracts (2d ed.1998) § 3.10, p. 237.)" (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270–271, italics added.)

"If there is no evidence establishing a manifestation of assent to the "same thing" by both parties, then there is no mutual consent to contract and no contract formation.'

17

[Citation.]" (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 243.) "'[U]nder the common law, "[s]ilence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance." [Citation.]' [Citations.]" (*C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1500.) Here there is no allegation that Baldwin contacted the Bank to accept the foreclosure moratorium. No binding contract was formed to apply the moratorium to Baldwin's default.

This conclusion is supported by the principles applicable in the analogous setting of direct mail offers by vendors. In *Harris v. Time, Inc.* (1987) 191 Cal.App.3d 449, Time, Inc. sent a direct mail advertisement which had a window revealing a statement that the recipient would receive a new calculator watch free just for opening the envelope by a designated deadline. The full text of the offer was revealed only on opening. It required the recipient to purchase a magazine subscription to receive the free watch. The *Harris* court concluded that "Time had no means of learning of the acceptance by performance. Thus the recipients of the offer were required to provide Time with notice of their performance within a reasonable period of time. Absent such notice, Time could treat the offer as having lapsed before acceptance. [Citations.]" (*Id*. at pp. 456–457.)

Baldwin has not and cannot allege a breach of contract theory based on the moratorium announcement because he did not take any action to accept the alleged offer to abstain from foreclosure in order to form a valid contract.

## B. Fraud

To state a fraud cause of action plaintiffs must allege "(1) a misrepresentation (false representation, concealment or nondisclosure); (2) knowledge of its falsity (or scienter); (3) intent to defraud, ie., to induce reliance; (4) justifiable reliance; and (5) resulting damage. [Citation.] (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.) "In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.) "'This particularity requirement necessitates pleading *facts* which "show how,

18

when, where, to whom, and by what means the representations were tendered. [Citation.]"' (*Ibid.*)

A plaintiff must allege that his reliance on the fraudulent representation was reasonable. "'"[I]f the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, . . . he will be denied a recovery.'" [Citation.]" (*Thrifty Payless, Inc. v. Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1240.) In order to show justifiable reliance, the plaintiff must demonstrate that "'circumstances were such to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation.' [Citation.]" (*OCM Principal Opportunities Fund v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864.) "'Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational. [Citation.]' [Citation.]" (*Id.* at p. 865.) "'Reliance can be proved in a fraudulent omission case by establishing that "had the omitted information been disclosed, [the plaintiff] would have been aware of it and behaved differently."' (*Boschma v. Home Loan Center, Inc.* [(2011)] 198 Cal.App.4th [230] 250–251.)" (*West, supra*, 214 Cal.App.4th at p. 794.)

We conclude that in this case, Baldwin's reliance on media reports of a foreclosure moratorium was not reasonable, particularly since he does not allege that he inquired whether the moratorium applied to his loan, or otherwise communicated with the Bank about the terms of the moratorium. By the time the moratorium was announced, the Forbearance Agreement had ended, Baldwin's loan was in default, and Baldwin was aware that the Bank had the right to pursue nonjudicial foreclosure under the express warnings stated in the Forbearance Agreement. Under these circumstances, it was unreasonable for Baldwin to rely in silence on a national media report. Baldwin cannot state a cause of action for fraud.

V

Section 17200 et seq. "is commonly referred to as the Unfair Competition Law (UCL). ""'"[T]he UCL creates "'three varieties of unfair competition—acts or practices which are *unlawful*, or *unfair*, or *fraudulent*.'" [Citation.]' [Citation.]" (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1501.) Unfair or fraudulent practices provide grounds for relief under section 17200. (*Yanting Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.) "'In order to state a cause of action under the fraud prong of the UCL a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. "The 'fraud' prong of [the UCL] is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived." [Citations.]' (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1167.)" (*Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 986.)

*A. Allegations*

Baldwin's cause of action for violation of section 17200 alleged that the Bank "engaged in deceptive business practices with respect to mortgage loan servicing, and foreclosure of residential properties and related matters. . . ." Several practices were identified as deceptive. One such practice was "Calling the HOMESAVER forbearance plan a 'forbearance' plan representing that the payments were made in consideration for the forbearance of foreclosure, but instead were applied to the underlying mortgage." The complaint alleged that Baldwin and other members of the public were induced to treat the program as part of a modification program or a "HOME SAVER" plan, or "to interpret and enforce the plan as a forbearance plan thereby depriving Mr. Baldwin and other California borrowers [of] their rights under the agreement."

Baldwin also alleged the Bank engaged in deceptive practices because it nonjudicially foreclosed on a security instrument (deed of trust) in violation of Civil Code section 2924. Baldwin claimed this caused a wrongful foreclosure of his home "with no right to challenge standing prior to foreclosure on a stranger to the 'deed of

20

trust'.'" He alleged the Bank used "robo signers" and that the trustee's deed upon sale has an attestation stating that the notary witnessed the execution of the document by the signatory on December 14, 2010 but it was actually executed on December 20, 2010. He also alleged that the notice of sale with which he was served differs from the recorded version because the one he received did not list the name of the trustee and had different language in violation of Civil Code section 2924c.

Other alleged violations of the nonjudicial foreclosure statutes included omissions in the notice of default and failure to serve it properly as well as failure to explore foreclosure alternatives with him 30 days before recording the notice of default in violation of Civil Code section 2923.5.[5] As to the foreclosure moratorium, Baldwin alleged that the Bank engaged in unlawful and unfair practices by publicizing the moratorium through mass media as we have previously described.

In a catchall allegation, Baldwin claimed that the Bank "engaged in 'fraudulent,' 'unfair' or 'unlawful' acts by violating various state laws and federal regulations, standards, and/or policies in making or causing to be made the land recordings in Los Angeles County, California County Recorder's office as particularly alleged above without any personal knowledge whether in fact the statements made in the documents were in fact true."

B. *Pleading Requirements*

We first dispose of the catchall allegations of the section 17200 claim which do not allege, as required, that the Bank's "conduct is tethered to an [ ] underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law." (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1365.) Baldwin attempts to satisfy this requirement by citing the public policy that led to the enactment of the California

---

[5] The sole remedy available for a violation of Civil Code section 2923.5 is a one-time postponement of nonjudicial foreclosure proceedings. (*Mabry v. Superior Court* (2010) 185 Cal.App.4th 208, 235.) Since Baldwin alleges that the foreclosure sale has already taken place, section 2923.5 cannot now provide him a remedy.

Homeowners Bill of Rights on July 11, 2012. Without citation to supporting authority, he claims the newly amended laws prohibit dual tracking (continuing to pursue nonjudicial foreclosure while borrower is seeking loan modification). These provisions do not go into effect until January 1, 2018 (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 904) and thus have no application here.

We also conclude that Baldwin has not, and cannot, allege the requisite causal connection between the alleged wrongdoing by the Bank and his injury. "'In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by "any person acting for the interests of itself, its members or the general public" (former § 17204, as amended by Stats. 1993, ch. 926, § 2, p. 5198), now private standing is limited to any "person who has suffered injury in fact and has lost money or property" as a result of unfair competition (§ 17204, as amended by Prop. 64, as approved by voters, Gen. Elec. (Nov. 2, 2004) § 3; see *Californians for Disability Rights v. Mervyn's LLC* [(2006)] 39 Cal.4th [223, at pp.] 227–228.)" (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320–321 (*Kwikset*).) Thus, a plaintiff must demonstrate some form of economic injury. (*Id*. at p. 323.)

"Proposition 64 requires that a plaintiff's economic injury come 'as a result of' the unfair competition . . . ." (*Kwikset*, *supra*, 51 Cal.4th at p. 326.) "'The phrase "as a result of" in its plain and ordinary sense means "caused by" and requires a showing of a causal connection or reliance on the alleged misrepresentation.' [Citations.]" (*Ibid.*) "[A] plaintiff 'proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions' [citation]. Consequently, 'a plaintiff must show that the misrepresentation was an immediate cause of the injury producing conduct. . . . ' [Citation.]" (*Id*. at pp. 326–327, fn. omitted.)

The Bank argues that Baldwin cannot satisfy these requirements because the loss of his home through nonjudicial foreclosure was caused by his default and not by any of its practices. The requisite causal connection between the alleged unlawful business

practice and the harm suffered by the plaintiff "is broken when a complaining party would suffer the same harm whether or not a defendant complied with the law." (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1099.) In that case, the court held that the plaintiff tenants could not allege a cause of action under the UCL based on alleged violation of the Subdivided Lands Act by the landlord because even if there had been full compliance, the tenants would still face eviction. (*Ibid.*)

In *Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497 (*Jenkins*), the plaintiff alleged that the defendants violated section 17200 by recording fraudulent documents in violation of Penal Code section 115.5 and the nonjudicial foreclosure statutes (Civ. Code, § 2924 et seq.). As a result of these unlawful, unfair, and fraudulent business practices, the plaintiff alleged that her home was subject to foreclosure and that she had suffered monetary damages. The Court of Appeal concluded that the plaintiff could not satisfy the causation element which required her to plead a causal link between her economic injury (the impending nonjudicial foreclosure) and the allegedly unfair or unlawful acts. The plaintiff admitted that she had defaulted on her loan and that this default triggered the lawful enforcement of the power of sale clause in the deed of trust, which subjected the house to nonjudicial foreclosure. (*Id*. at p. 522–523.) The court reasoned that the plaintiff could not assert that the impending foreclosure was caused by the defendants' wrongful actions, and therefore a demurrer to the cause of action was proper. (*Id*. at p. 523.) The *Jenkins* court concluded that amendment could not cure the standing defect because the purported wrongdoing by the defendants occurred after the plaintiff defaulted on her loan. (*Id*. at pp. 523–524.)

We conclude that our case is like *Jenkins*, *supra*, 216 Cal.App.4th 497. Baldwin cannot satisfy the causation element because he defaulted on his loan which triggered the nonjudicial foreclosure before any wrongdoing by the Bank.

**DISPOSITION**

The judgment of dismissal is affirmed.  The Bank is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


               EPSTEIN, P. J.

We concur:



WILLHITE, J.



SUZUKAWA, J.